# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-10-00364-CR

---

**Steve Garcia Jr., Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 391ST JUDICIAL DISTRICT
NO. D-09-0839-SA, HONORABLE THOMAS J. GOSSETT, JUDGE PRESIDING**

---

### M E M O R A N D U M   O P I N I O N

A jury convicted appellant Steve Garcia Jr. of the offense of murder. *See* Tex. Penal Code Ann. § 19.03(b)(3) (West 2011). Punishment was assessed at 85 years' imprisonment. In his sole issue on appeal, Garcia asserts that the district court abused its discretion in denying his motion to suppress a statement that, according to Garcia, was the product of custodial interrogation. We will affirm the judgment.

### BACKGROUND

Garcia was charged with causing the death of his seven-month-old stepson on or about May 2, 2009. On that date, the infant sustained serious injuries that would eventually lead to his death. Garcia was ultimately tried for the infant's death. Evidence presented at trial included testimony from police officers explaining their investigation into the cause of the infant's injuries; a medical examiner who performed the autopsy of the infant and found that the infant had suffered

"all sorts of injuries," including severe trauma to the brain; the crime scene investigator who found blood stains in Garcia's house and on clothing belonging to the infant; a DNA analyst who determined that the blood found at the crime scene matched the DNA profile of the infant; a crime scene technician who took photographs of the infant while he was being treated for his injuries at the hospital; the infant's pediatrician who testified that the infant was a "normal, developing child" prior to his death; the infant's mother, who testified to previous occasions when she had observed injuries to the infant after he had been in Garcia's care; daycare workers who had observed bruises and other injuries to the infant on prior occasions; a written statement from Garcia in which he admits to repeatedly "shaking" the infant "hard" and biting the infant's chin and ear because he has "fetishes for the chin and ear"; and Garcia, who testified in his defense and claimed that, while he had admittedly injured the infant on the date in question, it had been an accident.

At the center of this appeal, however, are video-recorded statements made by Garcia to officers at the police department on the day after the infant was injured. On the day the child was injured, at approximately 3:45 p.m., police officers went to Garcia's house to investigate how the infant's injuries had occurred. At that time, Garcia spoke with the officers regarding the infant's injuries. The following day, Garcia again spoke to the officers concerning the child's injuries, this time at the police department. The interview at the department, which was recorded and admitted into evidence during Garcia's trial, was the subject of Garcia's motion to suppress and is the basis of this appeal.

At the hearing on the motion to suppress, the district court considered the testimony of the three officers who had interviewed Garcia during the course of the investigation: Detective James Johnson, Detective Eddie Chavarria, and Detective Harvey Barrera, all with the

2

City of San Angelo Police Department. The district court also viewed portions of the video recording of the interview. A summary of the evidence presented at the suppression hearing follows.[1]

Detective Johnson testified that on May 2, 2009, he was first dispatched to the emergency room where the injured infant had been transported but was unable to see the infant because he was being treated by hospital personnel at that time. Johnson was then instructed by his supervisor to go to the infant's residence and investigate what had happened. Upon his arrival, Johnson met with Garcia "to try to assess what had gone on." Johnson asked Garcia "to try and explain to me what had happened," and Garcia proceeded to do so. Johnson recalled that he and Garcia began conversing "out in the yard and then we went out to my car and spoke so it would be a little bit quieter." According to Johnson, Garcia was not in handcuffs or in the back of a patrol car during the interview. Instead, "he was moving about freely." Johnson explained,

> He sat in the front seat of my car. I sat in the front seat of my car. My objective was to see if I could get information that could help with the treatment of the child. My understanding [was that] it was an accident that had taken place and he told me some information and I passed it on.

---

[1] In their briefs, both Garcia and the State refer primarily to testimony presented at the suppression hearing, although they also refer to trial testimony. Because it does not appear from the record that the motion to suppress was "re-litigated" by the parties during trial, we limit our review to the evidence that was presented during the suppression hearing. *See Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996). We note, however, that the officers' trial testimony concerning the circumstances surrounding the taking of the statement was largely consistent with their testimony at the suppression hearing, and Garcia does not contend otherwise.

At some point during their conversation, Johnson read to Garcia a "voluntary statement form" that contained the article 38.22 warnings.[2] Garcia signed and dated the form but did not provide any written statement explaining how the infant was injured. He did, however, write that he was giving Johnson "permission to search [his] house."

Shortly thereafter, Detective Chavarria arrived at the scene and also spoke with Garcia. Chavarria testified that when they met, Garcia "was outside the house in the driveway standing near some vehicles with other people" who appeared to be members of Garcia's family. Chavarria asked Garcia to explain what had happened to the infant. In response, Garcia "proceeded to tell [Chavarria] what he had already told Detective Johnson."

Toward the end of their conversation, Garcia told Chavarria "that he was too emotional" and that "he wasn't thinking straight." Chavarria testified that he then decided to "finish the interview and allow [Garcia] time to get his thoughts together." Chavarria explained,

> I then asked Mr. Garcia if he would be willing to meet with us on another date and time to provide us a formal statement, and it was mainly due to the fact that he had told us he wasn't thinking straight and he was emotional, so at that time Detective Johnson met with Mr. Garcia and they set up an appointment to meet at the police department the next day, which would have been a Sunday.

Johnson, in his testimony, provided additional details surrounding the scheduled meeting. He recalled, "I had told [Garcia] I was going to get a recorded statement of what he had told me and he understood that and he agreed to it." When asked whether Garcia was "going to get [to the department] himself" or if Johnson was "going to give him a ride," Johnson answered, "Either way.

---

[2] *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 2 (West 2005); *see also Miranda v. Arizona*, 384 U.S. 436 (1966).

4

I had offered either way, but he had told me he would provide his own transportation and that was the understanding when we parted that he would meet [sic] at the police department about 1:00 or 1300." After scheduling the interview, the officers left the residence at approximately 6:30 p.m., and they did not see Garcia again until the following day.

The next day, Johnson testified, he checked his voice mail and discovered a message from Garcia "saying that he would like to speak to me and he had some things that he needed to tell me." The message had been left at approximately 10:00 p.m. the previous night. After listening to the message, Johnson waited for Garcia to arrive at the agreed-upon time. However, Garcia "didn't come," so Johnson drove to Garcia's house "and met with him and he agreed to come to the station."[3] When asked what he had told Garcia at this time, Johnson testified,

> Well, I talked to him about missing the appointment and that we still needed to talk to him, I still wanted to get a record, a statement for record, and he agreed to it. I offered to allow him to drive himself. I don't know if he had transportation at the time, but I know he went with me and we just drove to the station.

Johnson added that "it would have been fine" if Garcia had decided to drive himself to the station and that it also "would have been fine" if Garcia had chosen not to go to the station. Johnson further testified that when he transported Garcia to the station, he did not place Garcia under arrest and "never took Steve in custody." Also, according to Johnson, Garcia was not in handcuffs during the drive and "was sitting in the front seat" of Johnson's car. In Johnson's opinion, Garcia had not been placed in custody at any point while Garcia was in his presence. When asked to characterize

---

[3] On cross-examination, Johnson testified, "I had several people I needed to talk to that day, so I went to two other addresses and then I went by Steve's address to talk to him, and when I contacted Steve at his home, I asked him about going to the station and he agreed to."

5

Garcia's demeanor during his encounters with him, Johnson testified, "I think he was cooperative, and if I could go further, I would say he was anxious to cooperate." Once they arrived at the department, Johnson took Garcia to the interview room, Garcia waited outside the room in the "inner lobby" of the "CID [Criminal Investigation Division] area," and eventually Chavarria arrived and the interview began.[4]

Chavarria testified that when he first met with Garcia that day, he "advised him that we were just there to talk about what we had discussed the previous day." Chavarria did not inform Garcia that he was under arrest, take him into custody, or place him in handcuffs. According to Chavarria, Garcia was still free to leave the police department at that time. In fact, Chavarria testified, if Garcia had asked to leave during the interview, he would have been allowed to leave. Chavarria also testified that at no time during the taking of the statement did Garcia ask to stop the interview. Chavarria recalled, "At one point he did ask to go to the restroom and we did allow him to go to the restroom." Chavarria added that no one was guarding the restroom and that, when Garcia was done, he "walked back into the interview room by himself." According to Chavarria,

---

[4] The interview began at approximately 4:45 p.m. and lasted until shortly after 6:00 p.m. The record is unclear as to how long Garcia was at the department before the interview began, although one could infer that it was approximately two-and-a-half hours. Johnson testified that he arrived at Garcia's house at approximately 1:30 p.m., that they "spent some time" at Garcia's residence and then drove directly to the police department, and that it took them approximately "ten, fifteen minutes" to arrive. Johnson estimated that they arrived at the department at approximately 2:00 p.m. Johnson testified that during the time between their arrival and the interview, he was with Garcia "off and on" and that Garcia "was allowed to move around" within the police station. Johnson explained, "It wasn't like he was being guarded . . . I know he was pretty much free to go. . . . I had other things to do and I went to my office and did some things, and they would call me and say it was ready and then something would come up and there would be another snag" causing the interview to be delayed.

6

during the interview, the door to the interview room was open, he and Barrera were in "plain clothes," and the firearms that they "more than likely" were wearing at the time were not displayed or exhibited.

Detective Barrera testified that he began watching the interview from another room "probably five minutes after it started." He explained that he entered the interview room approximately thirty minutes after it had begun and immediately proceeded to advise Garcia that he was not under arrest and that he was free to leave. Barrera acknowledged that he had not heard Chavarria convey that information to Garcia earlier in the interview.

During the suppression hearing, the district court viewed the first 28 minutes of the recorded interview.[5] During that portion of the interview, Garcia can be seen seated in the interview room at a small, round table, with Chavarria also seated at the table across from Garcia and Johnson seated to Chavarria's right. Chavarria is asking Garcia questions while Johnson, for the most part, is simply listening and taking notes. At one point during the interview, Chavarria leaves the room for a brief period while Johnson remains inside with Garcia. During this time, Johnson asks Garcia some questions about the incident. The door remains open during this period. Chavarria does not appear to be displaying or exhibiting any weapons during the interview, although he does have what appears to be a cell phone or other communication device attached to his waist. However, Johnson is wearing what appears to be a holster with a firearm attached, although the firearm appears to be

---

[5] While viewing the video, the district court asked defense counsel, "[I]t's my understanding that you object to everything up to the point where Detective Barrera tells him at 27.50 [minutes] that he is not under arrest and is free to leave?" Counsel responded, "That is accurate." The district court then asked the State, "Anything else in this video you want me to see?" The State answered, "I don't think it would probably assist the Court in making your decision to listen to the remainder of the recording." Garcia did not object to the district court viewing only that portion of the recording.

visible primarily from his back and Johnson is not taking any action to draw attention to the firearm. The door is open for the first 26 minutes of the interview, and Garcia is seated near the door. At around the 26-minute mark, Barrera appears outside the door, motions for Johnson to leave the room, and shortly thereafter enters the interview room himself. When he does so, he draws the door inward somewhat but leaves it partially open. Barrera appears to have something attached to his belt, although whether it is a firearm or merely a cell phone is unclear from the recording. Barrera proceeds to introduce himself to Garcia and advises him that they "asked him to come in simply because this is an investigation," that he is "not under arrest at this time," and that he is "free to leave at any time." Garcia indicates that he understands. The interview then continues, with both Chavarria and Barrera asking Garcia questions.

Chaverria testified that following the interview, Garcia agreed to provide a written statement. Barrera testified that prior to giving this statement, Garcia was advised of his statutory and *Miranda* rights and indicated that he understood those rights. After providing the written statement, Chavarria and Barrera accompanied Garcia to his residence, where Garcia provided a "walk-through demonstration" or "re-enactment" of what he claimed had happened to the infant. This demonstration was also video recorded. After Garcia provided the demonstration, he was at that time placed under arrest.

At the conclusion of the hearing, defense counsel asked the district court to suppress either the entire recorded interview or, in the alternative, the portion prior to Garcia being advised by Barrera that he was free to leave.[6] The district court denied the motion to suppress.

_____

[6] Although counsel asked that the entire interview be suppressed, as we noted earlier, he did not request that the district court review the entire interview, nor did he argue that the interview

8

Subsequently, the district court entered findings of fact and conclusions of law. Among its findings, the district court found that when the interview began, "neither detective advised the Defendant that he was not under arrest, and the warnings required by Article 38.22, Texas Code of Criminal Procedure were not given by the detectives at that time." The district court also made findings concerning the circumstances before, during, and after the interview, including that "after approximately 30 minutes of interview . . . Detective Barrera advised Defendant at that time that he was not under arrest and was free to leave." Based on these findings, the district court concluded that Garcia was not in custody or under arrest "when he agreed to go to the police station," "during the time he waited at the station for the interview to begin," or "at the start of or during the first interview which began at 4:44 p.m., May 3, 2009, at the police station."

The case proceeded to trial, and the jury found Garcia guilty as charged. Punishment was before the court, and the district court sentenced Garcia to 85 years' imprisonment. This appeal followed.

## STANDARD OF REVIEW

"A trial court's ruling on a motion to suppress, like any ruling on the admission of evidence, is subject to review on appeal for abuse of discretion." *Amador v. State*, 275 S.W.3d 872,

should be suppressed for reasons relating to the officers' conduct beyond the point when Barrera told Garcia that he was free to leave. Throughout his brief, Garcia refers to portions of the recording that the district court did not consider during the suppression hearing. Again, because the motion to suppress was not "re-litigated" during trial, and because Garcia did not object to the district court viewing only a portion of the recording, our review is limited to the portions of the recording that the district court was asked to consider. *See* Tex. R. App. P. 33.1; *Rachal*, 917 S.W.2d at 809 ("[I]n determining whether a trial court's decision is supported by the record, we generally consider only the evidence adduced at the suppression hearing because the ruling was based on it rather than evidence introduced later.").

878 (Tex. Crim. App. 2009) (citing *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)). "'In other words, the trial court's ruling will be upheld if it is reasonably supported by the record and is correct under any theory of law applicable to the case.'" *Id.* (quoting *Ramos v. State*, 245 S.W.3d 410, 417-18 (Tex. Crim. App. 2008)). "In reviewing a trial court's ruling on a motion to suppress, appellate courts must view all of the evidence in the light most favorable to the trial court's ruling." *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008). When a trial court makes explicit fact findings, as it did here, the appellate court determines whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports these fact findings. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006); *Figueroa v. State*, 250 S.W.3d 490, 508 (Tex. App.—Austin 2008, pet. ref'd). We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Kelly*, 204 S.W.3d at 818; *Figueroa*, 250 S.W.3d at 508.

We are to "afford almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor." *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). We are to "afford the same amount of deference to trial courts' rulings on 'application of law to fact questions,' also known as 'mixed questions of law and fact,' if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor." *Id.* A trial court's ultimate custody determination presents a mixed question of law and fact. *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007). "Therefore, we afford almost total deference to a trial judge's 'custody' determination when the questions of historical fact turn on credibility and demeanor." *Id.* at 526-27 (citing *Ripkowski*

10

*v. State*, 61 S.W.3d 378, 381 (Tex. Crim. App. 2001)). "Conversely, when the questions of historical fact do not turn on credibility and demeanor, we will review a trial judge's 'custody' determination de novo." *Id*. at 527.

## ANALYSIS

In his sole issue on appeal, Garcia asserts that the district court abused its discretion in denying his motion to suppress the recorded interview because, in his view, it was the product of custodial interrogation and he was not warned of his statutory and *Miranda* rights prior to giving the statement. In response, the State argues that Garcia was not in custody at the time his statement was taken. In the alternative, the State argues that any error was harmless.

The warnings set out in *Miranda* and Article 38.22 are required only when a person is subject to "custodial interrogation." *See* Tex. Code Crim. Proc. Ann. art. 38.22, §§ 3, 5; *Miranda*, 384 U.S. at 442-57, 467-79; *Herrera*, 241 S.W.3d at 525. "Custodial interrogation" is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. A person is in "custody" only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest. *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996) (citing *Stansbury v. California*, 511 U.S. 318, 322 (1994)); *Bartlett v. State*, 249 S.W.3d 658, 668 (Tex. App.—Austin 2008, pet. ref'd). The "reasonable person" standard presupposes an innocent person. *Dowthitt*, 931 S.W.2d at 254 (citing *Florida v. Bostick*, 501 U.S. 429, 438 (1991)); *Bartlett*, 249 S.W.3d at 669. Moreover, the determination of custody depends on the objective circumstances of the interrogation, not the

11

subjective views of the person being questioned or the subjective intent of the officer to arrest or not arrest. *Stansbury*, 511 U.S. at 323; *Dowthitt*, 931 S.W.2d at 254; *Bartlett*, 249 S.W.3d at 669. The court of criminal appeals has outlined at least four general situations which may constitute custody: "(1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave." *Dowthitt*, 931 S.W.2d at 255. Garcia's argument implicates the third and fourth situations. Garcia claims that the officers' actions before and during the interview created a situation that would lead a reasonable person to believe he was in custody. Garcia also asserts that the officers had probable cause to arrest him before and during the interview, and they did not tell him that he was free to leave until approximately thirty minutes into the interview.

Garcia points to several facts in the record to support his theory that the law enforcement officers created a situation that would lead a reasonable person to believe that his freedom of movement had been significantly restricted. These facts include: (1) the presence of multiple officers at Garcia's residence on the day the infant was injured; (2) the decision by Johnson to speak with Garcia in his patrol car; (3) Johnson asking for and obtaining written consent from Garcia to search his residence; (4) Johnson and Chavarria asking Garcia to come to the department to provide a formal statement; (5) Johnson going to Garcia's house the following day and transporting Garcia to the department in his patrol car; (6) the length of Garcia's wait at the department prior to the interview beginning; (7) Garcia's apparent isolation at the department while

12

waiting for the interview to begin; and (8) some of the circumstances during the interview, including that it occurred in a "small, windowless room," that two of the three detectives may have been "armed" during the interview, and that certain questions asked by the detectives suggest that they already had reason to believe Garcia had committed a crime.

While the above facts *could* support a finding that Garcia was in custody, they do not compel such a finding or conclusively establish that fact, particularly when they are considered in the context of numerous other facts in the record which support a finding that law enforcement did not create a situation that would lead a reasonable person to believe that his freedom of movement had been significantly restricted. On the day before the interview, evidence of these facts includes: (1) Garcia was "moving about freely" when Johnson first encountered him; (2) Garcia and Johnson began conversing "out in the yard," and when they moved the conversation to Johnson's patrol car "so it would be a little bit quieter," Garcia was conversing with Johnson in the front seat of the car; (3) after Garcia's conversation with Johnson, when Chavarria first encountered him, Garcia was standing outside talking to other people who appeared to be family members, not law enforcement officers; (4) Chavarria ended his interview with Garcia when Garcia indicated that he was "too emotional" to continue; (5) when requesting that he come to the department to provide a statement, Johnson provided Garcia with the option of either driving himself or being provided transportation; (6) Garcia agreed to meet with the officers at the department the following day; (7) after speaking with Garcia, the officers departed the residence and Garcia was not taken into custody; and (8) Garcia re-initiated contact with police that night, when he left a voice message telling Johnson "that he would like to speak to [him] and he had some things that he needed to tell [him]."

13

On the day of the interview, evidence of facts supporting the district court's finding includes: (1) Garcia agreed to go to the department when Johnson arrived at his house; (2) Garcia sat in the front seat of Johnson's car and was not handcuffed or otherwise restrained during the drive; (3) Johnson characterized Garcia as cooperative and "anxious to cooperate" during his encounters with him; (4) when they arrived at the department, Garcia was left unguarded in the lobby while he waited for the interview to begin; (5) during the wait, Johnson was with Garcia "off and on" because Johnson "had other things to do"; and (6) Johnson testified that Garcia was "allowed to move around" within the department during the wait.

During the interview, evidence of facts supporting the district court's finding include: (1) the door to the interview room was left open; (2) Garcia was seated near the door and would not have had to walk past the detectives to leave the room; (3) Garcia was not in handcuffs or otherwise restrained during the interview; (4) Chavarria and Johnson were seated across from Garcia several feet away from him; (5) the officers were in "plain clothes" during the interview; (6) Chavarria did not display or exhibit a firearm during the interview, and although both Johnson and Barrera appeared to be wearing firearms, neither officer took any action to draw attention to those firearms; (7) Garcia was allowed to use the restroom during the interview; (8) the officers made no gestures or comments that appeared to be threatening; (9) when the officers entered and exited the interview room, the door remained open; (10) during the interview, Garcia was told that he was "not under arrest at this time" and was "free to leave at any time"; (11) at no time during the interview was Garcia told that he was under arrest or was not free to leave; and (12) at no point did Garcia ask to stop the interview.

14

Viewing the above evidence in the light most favorable to the district court's ruling, the record supports a finding that law enforcement did not create a situation that would lead a reasonable person to believe that his freedom of movement had been significantly restricted. Accordingly, we cannot conclude that the district court abused its discretion in determining that Garcia was not in custody for that reason. *See Rodriguez v. State*, 939 S.W.2d 211, 215 (Tex. App.—Austin 1997, no pet.) ("In reviewing the trial court's decision [on suppression], an appellate court does not engage in its own factual review; it determines only whether the record supports the trial court's findings.").[7]

As for Garcia's assertion that he was in custody because the officers had probable cause to arrest him prior to or during the interview, probable cause alone is not enough to create a custody situation. The law "dictates that the officers' knowledge of probable cause be manifested to the suspect." *Dowthitt*, 931 S.W.2d at 255. "Such manifestation could occur if information substantiating probable cause is related by the officers to the suspect or by the suspect to the officers." *Id*. The record in this case supports a finding that during the relevant time periods, no such information was related to or from Garcia. On the day prior to the interview, when the officers first spoke to Garcia, they did not even know if a crime had occurred. Johnson testified that when he first spoke with Garcia, his "understanding [was that] it was an accident that had taken place."

---

[7] In his brief, Garcia points to certain fact findings made by the district court that, he contends, are not supported by the record, specifically that Johnson called Garcia on May 3, 2009, and that Garcia explained to Johnson during the call that "he did not have a ride to the police station." Although we agree with Garcia that some findings do not appear to have record support, they are ultimately not material to the resolution of the custody issue. In our analysis, we have considered only the fact findings that are supported by the record. *See State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006).

Similarly, Chavarria recalled, "At that time we had no other information to lead us to believe that a crime had occurred . . . it was still unknown."

On the day of the interview and during the interview, the information conveyed by the officers to Garcia and by Garcia to the officers may have established that Garcia was a suspect, but none of the officers testified that they conveyed information to Garcia or that he conveyed information to them that manifested probable cause to arrest him. The recording reflects that during the portion of the interview that the district court considered, Chavarria was asking questions about what had happened, and inquiring into whether there might have been an accident that caused the infant's injuries and whether Garcia or someone else was responsible for such an accident. Regardless of whatever suspicions the officers may have had at that time, prior to Barrera's entry into the room, the officers did not convey any information to Garcia in a manner that indicated they had probable cause to arrest him. *See Stansbury*, 511 U.S. at 323 ("Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."). The record does reflect that after Barrera entered the room, the officers began questioning Garcia in a manner that suggested they now suspected him of having intentionally injured the child, while Garcia began conveying information to the officers that appeared to confirm their suspicions. However, this did not occur until after Barrera had advised Garcia that he was "not under arrest" and "free to leave at any time." Thus, from that moment on, even if the officers had manifested probable cause to arrest Garcia, the fourth situation was not implicated. *See Dowthitt*, 931 S.W.2d at 955 (fourth situation implicated "when there is probable cause to arrest *and* law enforcement officers do not tell the suspect that he is free to leave" (emphasis added)).

16

Moreover, only "in certain unusual situations" will the manifestation of probable cause to arrest be sufficient to trigger custody. *State v. Stevenson*, 958 S.W.2d 824, 829 n.7 (Tex. Crim. App. 1997). In fact, "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." *Stansbury*, 511 U.S. at 324. The manifestation of probable cause "does not automatically establish custody; rather, custody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest." *Dowthitt*, 931 S.W.2d at 255. The record in this case supports a finding that even if the officers did have probable cause to arrest Garcia, the other circumstances surrounding the interview, which we have already summarized above, would not lead a reasonable person to believe that he was under restraint to the degree associated with a formal arrest.

Finally, we agree with the State that, even if the district court abused its discretion in denying the motion to suppress, such error was harmless. "If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." Tex. R. App. P. 44.2(a). There are several factors to be considered in determining whether constitutional error in the admission of evidence is harmless, including: the importance of the evidence to the State's case; whether the evidence was cumulative of other evidence; the presence or absence of other evidence corroborating or contradicting the evidence on material points; the overall strength of the State's case; and any other factor, as revealed by the record, that may shed light on the probable impact

of the error on the minds of the average juror. *Clay v. State*, 240 S.W.3d 895, 904 (Tex. Crim. App. 2007); *Ramos v. State*, 273 S.W.3d 356, 359 (Tex. App.—San Antonio 2008, pet. ref'd). Additional factors include the source and nature of the error, the emphasis placed upon the evidence by the State, how much weight a juror might have placed on the evidence, and whether finding the error harmless would encourage the State to repeat the conduct. *Ramos*, 273 S.W.3d at 359 (citing *Harris v. State*, 790 S.W.2d 568, 587 (Tex. Crim. App. 1990)). A constitutional error does not contribute to the conviction or punishment if the jury's verdict would have been the same even if the erroneous evidence had not been admitted. *See Clay*, 240 S.W.3d at 904.

This was not a close case. The evidence of Garcia's guilt can be fairly characterized as overwhelming. Garcia admitted that he was the sole caretaker of the infant when the infant was injured. The medical examiner testified that the infant died as a result of severe trauma to his brain and explained how his injuries were not consistent with an accident. Photographs of the injured infant were admitted into evidence. Blood found inside the house and on the infant's clothing matched the infant's DNA profile. Other witnesses, including the infant's mother, testified that they had observed other injuries to the infant on previous occasions. Garcia's recorded interview at the department was only one of several statements made by Garcia that were admitted into evidence during trial, including a written statement in which Garcia confesses to repeatedly "shaking" the infant "hard" and "biting" the infant's chin and ear because he has "fetishes for the chin and ear." The video recording of Garcia's "walk-through demonstration" of what he claimed had happened to the infant was also admitted into evidence. Thus, the statements at issue in this appeal are merely cumulative of other statements implicating Garcia in the infant's death that are not contested on appeal. We also observe that the State did not emphasize the disputed interview during its closing

18

argument. Instead, the emphasis was on numerous inconsistencies in Garcia's trial testimony, the physical evidence in the case, and the testimony of the medical examiner and many other witnesses who provided testimony implicating Garcia in the infant's death. On this record, we are convinced beyond a reasonable doubt that the admission of the interview, even if erroneous, did not contribute to Garcia's conviction or punishment. *See* Tex. R. App. P. 44.2(a); *Ramos*, 273 S.W.3d at 360-62.

We overrule Garcia's sole issue.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Rose

Affirmed

Filed:   August 17, 2011

Do Not Publish